STATE OF NORTH CAROLINA v. DARRELL WAYNE MANESS

No. 402A06

(Filed 18 June 2009)

## 1. Jury— capital selection—voir dire—stake out questions— repetitive questions

The trial court did not abuse its discretion in a capital first-degree murder case by not allowing defense counsel to question prospective jurors about their ability to surrender their honest convictions for the purpose of returning a sentencing recommen-dation, and to recommend a life sentence even if other jurors dis-agreed, because: (1) in regard to the voir dire of one prospective juror, the hypothetical question was an impermissible "stake out" question designed to determine how well a prospective juror would withstand pressure to change his or her mind when jurors disagree; and (2) in regard to the voir dire of a second prospec-tive juror, the questions asked this prospective juror were redun-dant where a review of the complete voir dire revealed that the trial court previously had allowed defense counsel to ask the prospective juror if he could consider life in prison without parole as an appropriate punishment, follow the law as instructed by the trial court, independently weigh the evidence and respect the opinion of other jurors, and be strong enough to ask other jurors to respect his opinion.

## 2. Jury— capital selection—peremptory challenges—*Batson* challenge—gender challenge

Defendant's constitutional right to a jury selected without regard to race or to gender was not violated when the trial court overruled his objections to the State's use of peremptory chal-lenges against five prospective jurors who were either female, African-American, or both in a prosecution for capital first-degree murder and other crimes because: (1) in regard to the *Batson* challenge of prospective juror Maultsby, the State met its burden and gave several race neutral reasons to combat a prima facie case of race-based discrimination; (2) as to defendant's claim of impermissible gender discrimination, defendant amended the record on appeal to include an assignment of error alleging gender discrimination against prospective juror Maultsby, but an assignment of error cannot substitute for proper preservation of an issue before the trial court, defendant

failed to argue plain error, and defendant's claim of gender bias in the State's peremptory challenge of a prospective juror was not an exceptional circumstance calling for invocation of N.C. R. App. P. Rule 2; (3) in regard to four other prospective jurors where defendant addresses both their race and their gender, neither the United States Supreme Court or our Supreme Court has found that being a female member of a racial minority group is an independent basis for an objection to the State's exercise of a peremptory challenge; (4) defendant did not raise and preserve the issue of gender discrimination before the trial court, and thus as to prospective jurors Gilliard and Boyd, defendant may not make a gender discrimination argument for the first time on appeal; (5) in regard to prospective juror Simmons, a prima facie showing is not automatically made when the minority acceptance rate is 37.5%; (6) in regard to prospective jurors Simmons and Gilliard, defendant does not assert, and the record does not indicate, that the race of defendant, the victim, or any key witness was a factor in defendant's trial; and (7) although defendant used a similar statistical analysis to support a claim that the State's peremptory challenge of prospective juror Britt was made on the basis of gender discrimination, the trial court noted that the State had at that point seated three females, used an almost equal number of challenges on males and females, and treated Britt no differently than other prospective jurors during questioning.

### 3. Jury— jury request to review exhibits—abuse of discretion standard

The trial court did not commit prejudicial error or abuse its discretion in a prosecution for capital first-degree murder and other crimes when it denied a jury request to review certain exhibits because: (1) the trial court noted numerous times that it was denying the jury's request in its discretion, and thus it correctly understood that it was permitted to exercise its discretion pursuant to N.C.G.S. § 15A-1233; (2) although the trial court made a trivial mistake when it attempted to recall specific words spoken when the exhibits were first discussed, the trial court's ruling was amply supported by the record since the exhibits were admitted solely for the purpose of illustrating an expert's testimony, the jury already had seen the exhibits in their entirety, and the transcript of the discussion between the trial court and the parties when the exhibits were initially admitted indicated that these exhibits did contain some inadmissible material; and (3)

although defendant now contends that the trial court's action violated his constitutional rights to present evidence, a fair trial, due process of law, and a reliable capital sentencing hearing, defendant did not raise these constitutional issues below, and constitutional issues not raised at trial will generally not be considered for the first time on appeal.

**4. Criminal Law— motion for mistrial—officers approached jury box**

The trial court did not err in a prosecution for capital first-degree murder of a law enforcement officer and other crimes by denying defendant's motion for a mistrial made when law enforcement officers approached the jury box while autopsy photographs of the victim were being circulated to the jury because: (1) the officers were immediately directed to sit back down as soon as the court perceived what was happening; (2) the judge who observed the episode believed that jurors may not have even noticed the officers' conduct; did not believe that any jurors had been intimidated; found that little, if any, potential prejudice had occurred; and concluded that any further mention of the incident to the jurors would be counterproductive; and (3) assuming that the jurors did notice the officers' conduct, several plausible inferences could have been drawn including the State's suggestion to the trial court that the officers were shielding the victim's mother from the photographs, or the court's response that the officers may have wanted to look at the photographs themselves; and whatever the cause of the officers' behavior, the trial court acted promptly and effectively to regain control of the courtroom.

**5. Robbery— dangerous weapon—motion to dismiss—sufficiency of evidence—weapon stolen from victim—continuous transaction**

The trial court did not err by denying defendant's motion to dismiss the charge of robbery with a dangerous weapon even though defendant contends he was not armed until he took the victim police officer's firearm and the object taken in the robbery was the officer's firearm because: (1) an armed robbery can be a continuous transaction, and where a continuous transaction occurs, the temporal order of the threat or use of a dangerous weapon and the taking is immaterial; (2) despite defendant's argument to the contrary, there is no reason why the use of a weapon stolen from the victim cannot also be a part of the con-

tinuing transaction of the armed robbery; and (3) the evidence presented was sufficient for the jury to find that defendant's use of the gun was inseparable from the taking of it and defendant's efforts to flee.

**6. Sentencing— capital—nonunanimous recommendation— instruction to resume deliberations—failure to impose life sentence**

The trial court did not err in a capital sentencing proceeding by concluding that it lacked authority to impose a life sentence in this case at the time defendant made his motion when the jury initially returned with a nonunanimous sentencing recommendation and by instructing the jury to resume its deliberations because: (1) contrary to defendant's argument, N.C.G.S. § 15A-2000(b) requires that a sentence recommendation in a capital case be agreed upon by a unanimous vote of twelve jurors, and the statute authorizes the court to impose a sentence of life imprisonment in the absence of jury unanimity only when the jury cannot, within a reasonable time, agree on its sentence recommendation; (2) a nonunanimous poll does not necessarily indicate that a jury cannot agree to a unanimous sentencing recommendation within a reasonable time, nor does such a poll automatically give the trial court authority to impose a life sentence; (3) the jury had deliberated for little more than an hour and a half, no evidence suggested that the jury could not agree, and the jury had given no indication that it was having trouble reaching a sentencing recommendation; and (4) the issue whether the jury might be unable to agree unanimously on a sentence recommendation was never raised.

**7. Criminal Law— capital sentencing—motion for mistrial— exercise of discretion**

The trial court did not fail to exercise its discretion in a capital sentencing proceeding when it denied defendant's motions for a mistrial based on the premise that jurors had seen the reactions of those in the courtroom when the initial verdict indicating a recommendation of a life sentence was read because: (1) the record did not indicate that the trial court believed it had no discretion to declare a mistrial; and (2) each time it ruled on defendant's mistrial motions, the trial court specifically stated that it was denying the motions in its discretion.

**8. Sentencing— capital—aggravating circumstances— avoiding lawful arrest—committed against law enforcement officer**

The trial court did not commit plain error in a capital sentencing proceeding by allowing the jury to consider both the N.C.G.S. § 15A-2000(e)(4) (crime committed to avoid or prevent a lawful arrest) and N.C.G.S. § 15A-2000(e)(8) (crime committed against law enforcement officer while engaged in performance of official duties) aggravating circumstances because: (1) our Supreme Court has already concluded that the (e)(4) aggravating circumstance focuses on the defendant's subjective motivation for his actions whereas (e)(8) pertains to the underlying factual basis of the crime; and (2) in the instant case, the (e)(4) aggravating circumstance focused on defendant's subjective intention to avoid being arrested, while the (e)(8) aggravating circumstance addressed the objective fact that the victim was a law enforcement officer performing his official duties.

**9. Sentencing— capital—nonstatutory mitigating circumstances—cooperative with officers and polite during interviews—acceptance of responsibility for his criminal conduct**

The trial court did not err in a capital sentencing proceeding by failing to give requested peremptory instructions as to two nonstatutory mitigating circumstances that defendant was cooperative with officers after being taken into custody and polite during interviews, and defendant has accepted responsibility for his criminal conduct, because: (1) as to the instruction that defendant was cooperative and polite, while some evidence supported the instruction, other evidence indicated that defendant was neither cooperative with officers after being apprehended nor polite during interviews; and (2) as to defendant's requested instruction that he accepted responsibility for his criminal conduct, the record indicated that while defendant admitted killing the officer and acknowledged that the killing was a terrible mistake, he authorized his attorneys to concede guilt to second-degree murder only; and our Supreme Court has previously concluded that a defendant's willingness to plead guilty to second-degree murder is evidence only of defendant's willingness to lessen his exposure to the death penalty or a life sentence upon a first-degree murder conviction.

**10. Sentencing— death penalty—proportionality**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate because: (1) defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule; (2) the trial court found the four aggravating circumstances that the murder was committed for the purpose of avoiding or preventing a lawful arrest, the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon, the murder was committed against a law enforcement officer while engaged in the performance of his official duties, and the murder was part of a course of conduct in which defendant engaged that included the commission by defendant of other crimes of violence against other persons; (3) nothing in the record indicated that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (4) our Supreme Court has never found a death sentence to be disproportionate when the jury found more than two aggravating circumstances to exist, and has found the N.C.G.S. § 15A-2000(e)(11) violent course of conduct circumstance, standing alone, sufficient to support a death sentence.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joins in the dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge D. Jack Hooks, Jr. on 4 April 2006 in Superior Court, Brunswick County, upon a jury verdict finding defendant guilty of first-degree murder. On 10 July 2008, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 10 September 2008.

*Roy Cooper, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*M. Gordon Widenhouse, Jr.; and Staples S. Hughes, Appellate Defender, by Katherine Jane Allen, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

Defendant Darrell Wayne Maness was indicted for one count of murder, three counts of attempted first-degree murder, three counts

of assault with a deadly weapon with the intent to kill, three counts of assault with a firearm on a law enforcement officer, and one count of robbery with a dangerous weapon. Defendant was tried by jury and on 31 March 2006 was convicted of one count of first-degree murder on the basis of malice, premeditation and deliberation, and also under the felony murder rule. He was also convicted of two counts of attempted first-degree murder, two counts of assault with a deadly weapon with the intent to kill, two counts of assault with a firearm on a law enforcement officer, and one count of robbery with a firearm. Following a capital sentencing hearing, the jury recommended a sentence of death.

Defendant appealed his capital conviction to this Court and we allowed his motion to bypass the Court of Appeals as to his other convictions. We find that defendant's trial and capital sentencing proceeding were free from error and that defendant's sentence of death is not disproportionate.

At approximately one o'clock a.m. on 18 January 2005, Officer Mitchell Prince of the Boiling Spring Lakes Police Department pulled over a gray Honda after it swerved to avoid a deer. Defendant was driving, Michael Brennan sat in the passenger seat, and Tia Isley was in the back seat. Officer Prince asked defendant for his driver's license and vehicle registration. According to Brennan, defendant gave Officer Prince the registration but claimed he did not have identification. Officer Prince took the registration back to his car, where he determined that the Honda was registered under Tia Isley's name. Officer Prince returned to the Honda, asked defendant a few questions, then requested that he step out of the car. Officer Prince searched defendant and found an empty marijuana baggie and, in defendant's back pocket, an identification card.

Defendant told Officer Prince that marijuana was beneath the passenger seat. Officer Prince looked but did not find marijuana in the car, although he did find a partially full E & J Brandy bottle. Brennan poured out the brandy and Isley placed the empty bottle in a trash bag on the floorboard. Officer Prince then saw a bag of marijuana underneath the Honda and asked defendant to show him where the rest of it was. Although witnesses testified that defendant knew marijuana was in a backpack in the Honda's trunk, defendant looked only in the passenger compartment, without success.

When defendant failed to locate contraband, Officer Prince attempted to handcuff him. Defendant resisted by picking up the

trash bag containing the empty brandy bottle and repeatedly hitting Officer Prince on the head with it. As Officer Prince struggled to subdue defendant, they fell into a water-filled ditch beside the road. Defendant emerged with Officer Prince's gun, and Officer Prince crawled out of the ditch repeating words to the effect of, "Please don't kill me; please don't kill me." Brennan testified that defendant told Officer Prince to "shut up." Then, as a backup police car arrived, defendant shot Officer Prince three times while Officer Prince was on his knees. Officer Prince suffered two gunshot wounds to his head, while the third shot hit him in the right shoulder. He died before he could be taken to a hospital.

Defendant then fired at the backup officer, reentered the Honda, and drove away. Brennan and Isley remained at the scene, refusing defendant's directive to get back in the car. A chase involving two police vehicles ended after approximately two miles when defendant stopped, exited the Honda, and shot out a window of one of the pursuing police cars. The officers returned fire and defendant ran to a nearby mobile home. Two men and two women, one carrying an infant, emerged from the mobile home in response to police instructions. The record contains no indiction that these individuals knew defendant or had any connection with him. Defendant was discovered hiding beneath the home by the officers, who pulled him out and arrested him.

Defendant was placed inside a sheriff's department S.W.A.T. van and advised of his *Miranda* rights. Defendant agreed to speak to the investigators and stated that he hit Officer Prince with the bottle at least twice, that Officer Prince was begging "Please, don't shoot. Please. Please," and that he blacked out and shot Officer Prince. When Brunswick County Sheriff's Department Chief Deputy Cummings asked defendant why he shot at the other officers, defendant responded that he shot one, so why not two.

Additional facts will be set forth as necessary for the discussion of specific issues.

## JURY SELECTION ISSUES

[1] Defendant contends the trial court erred by not allowing defense counsel to question prospective jurors about their ability (1) to not surrender their honest convictions for the purpose of returning a sentencing recommendation and (2) to recommend a life sentence even if other jurors disagreed. "The *voir dire* of prospective jurors serves a two-fold purpose: (i) to determine whether a basis for chal-

lenge for cause exists, and (ii) to enable counsel to intelligently exercise peremptory challenges." *State v. Gregory,* 340 N.C. 365, 388, 459 S.E.2d 638, 651 (1995), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). A defendant in a capital case "should be given great latitude in examining potential jurors." *State v. Conner,* 335 N.C. 618, 629, 440 S.E.2d 826, 832 (1994). Nevertheless, "[r]egulation of the manner and the extent of inquiries on *voir dire* rests largely in the trial court's discretion." *State v. Green,* 336 N.C. 142, 164, 443 S.E.2d 14, 27, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). A defendant claiming that his or her *voir dire* was erroneously restricted must show both that the restriction was an abuse of discretion and that he or she was prejudiced thereby. *State v. Jones,* 339 N.C. 114, 134, 451 S.E.2d 826, 835 (1994), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). The trial court has significant discretion in controlling the jury *voir dire.* *See Gregory,* 340 N.C. at 389, 459 S.E.2d at 651 (finding no abuse of discretion when "[t]he majority of defendant's questions to which the prosecutor's objections were sustained were either irrelevant, improper in form, attempts to 'stake out' a juror, questions to which the answer was admitted in response to another question, or questions that contained an incomplete statement of the law").

Defendant contends the trial court erred in restricting his *voir dire* of prospective juror Teresa Register. The following exchange took place between defense counsel and Register:

> Q. Do you think you could, if you were convinced that life imprisonment without parole was the appropriate penalty after hearing the facts, the evidence, and the law from the Judge and you were convinced that it was the appropriate penalty, could you come back and return a verdict of life imprisonment without parole?
>
> A. Yes.
>
> Q. Even if your fellow jurors were of different opinions?
>
> [PROSECUTOR]: Well, objection.
>
> [THE] COURT: Sustained.

The State responds that defense counsel was attempting to stake out the juror. "Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts." *State v. Vinson,* 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *judgment vacated in part*

*on other grounds,* 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). "[S]uch questions tend to 'stake out' the juror and cause him to pledge himself to a future course of action." *Id.* In addition, hypothetical questions tend to confuse jurors who have not yet heard evidence or been instructed on the applicable law. *Id.*

This Court has held that it was not error for a trial court to disallow the following attempted *voir dire* query:

> "If, after the State has put on all of its evidence and after you have heard all the evidence in the case and after the Judge has instructed you, you held an opinion that the defendant was not guilty, that the State had not met its burden of proof in this case, would you change that opinion simply because eleven other jurors held a different opinion, that opinion being that the Defendant is guilty? Would any of you change your opinion simply for that reason?"

*State v. Bracey,* 303 N.C. 112, 118-19, 277 S.E.2d 390, 395 (1981). Such a question, designed to determine how well a prospective juror would withstand pressure to change his or her mind when jurors disagree, is an impermissible "stake out." *State v. Elliott,* 344 N.C. 242, 262, 475 S.E.2d 202, 209, *cert. denied,* 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). The hypothetical question at issue here was a "stake out" question similar to the one disallowed in *Bracey,* and the trial court did not err in excluding it.

Defendant also argues that the trial court erred in restricting his *voir dire* of prospective juror Chester Davis. During his questioning of the prospective juror, defense counsel stated that: "Now, his Honor may charge you at one point on what some attorneys call an Allen charge and I'm going to read it to you and ask you if you would be able to follow that law if the Judge did instruct you that way." The prosecutor objected, and, outside the presence of the jury, defense counsel advised the trial court that he intended to read the following to prospective juror Davis:

> [I]f you were given an instruction that you, all as jurors, have a duty to consult with one another and to deliberate with a view of reaching an agreement if it can be done without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with fellow jurors.
>
> . . . .

In the course of deliberations, each of you should not hesitate to reexamine your own views and change your opinion if it is erroneous. But none of you should surrender your honest conviction as to the weight or the effect of the evidence solely because [sic] your opinion or your fellow juror's, or for the mere purpose of returning a verdict.

After considering arguments of counsel, the trial court sustained the prosecutor's objection.

Our review of the complete *voir dire* of prospective juror Davis reveals that the trial court previously had allowed defense counsel to ask Davis if he could consider life in prison without parole as an appropriate punishment, follow the law as instructed by the trial court, independently weigh the evidence and respect the opinion of other jurors, and be strong enough to ask other jurors to respect his opinion. Thus, defendant's proposed question added little new. A trial court permissibly may limit redundant questions during *voir dire*. *State v. Huffstetler*, 312 N.C 92, 104, 322 S.E.2d 110, 118 (1984) ("The trial court did not abuse its discretion or commit error by preventing repetitious questions to prospective jurors."), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Moreover, there was no indication at this early stage of the trial that an *Allen* instruction would be either necessary or given. The trial court did not refuse to allow a permissible line of *voir dire* inquiry. Accordingly, the trial court did not abuse its discretion in sustaining the State's objection.

[2] Defendant next contends he is entitled to a new trial because his constitutional right to a jury selected without regard to race or to gender was violated when the trial court overruled his objections to the State's use of peremptory challenges against five prospective jurors who were either female, African-American, or both. Article I, Section 26 of the North Carolina Constitution prohibits exclusion "from jury service on account of sex, race, color, religion, or national origin." The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution also prohibits discrimination in jury selection on the basis of race, *see Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), or gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89 (1994).

Our review of race-based or gender-based claims of discrimination in petit jury selection has been the same under the Constitution of the United States and the North Carolina Constitution. *See State v.*

*Taylor*, 362 N.C. 514, 527, 669 S.E.2d 239, 253-54 (2008) (race); *State v. Bates*, 343 N.C. 564, 595-96, 473 S.E.2d 269, 286-87 (1996) (gender), *cert. denied*, 519 U.S. 1131, 136 L. Ed. 2d 873 (1997); *but cf. State v. Cofield*, 320 N.C. 297, 301-08, 357 S.E.2d 622, 624-29 (1987) (finding that racial discrimination in selection of a grand jury foreperson violates the United States and North Carolina Constitutions, and stating that "Article I, section 26 (of the North Carolina Constitution) does more than protect individuals from unequal treatment"). A party alleging either a race-based or gender-based discriminatory peremptory challenge of a prospective juror "must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B.*, 511 U.S. at 144-45, 128 L. Ed. 2d at 106-07 (citing *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). If a prima facie case of gender-based discriminatory dismissal is established, the burden shifts to the prosecutor to articulate a gender-neutral explanation. *Id.* Similarly, if a defendant establishes a prima facie case of race-based discriminatory dismissal, the burden shifts to the prosecutor to establish a race-neutral explanation. *Rice v. Collins*, 546 U.S. 333, 338, 163 L. Ed. 2d 824, 831 (2006). The prosecutor's explanation need not rise to the level of a challenge for cause, but it must be comprehensible and not pretextual. *Id.*; *J.E.B.*, 511 U.S. at 145, 128 L. Ed. 2d at 107. A defendant may respond by introducing evidence that the State's explanations are in fact a pretext. *Bates*, 343 N.C. at 596, 473 S.E.2d at 287 (citing *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991)). The trial court's findings regarding intentional discrimination will not be disturbed unless clearly erroneous. *Id.*

When the State excused prospective juror Sanica Maultsby, defense counsel objected "on a *Batson* ground." "[F]inding the existence of at least what can be described as a prima facie case," the trial court directed the State to offer "a race neutral reason." The prosecutors indicated that, because prospective juror Maultsby had been treated for obsessive compulsive disorder and also had worked as a detoxification nurse involved in mental health counseling and in working with substance abusers, they feared she would overly identify with defense evidence pertaining to defendant's cannabis dependence and attention deficit disorder. Defense counsel declined to be heard in response and the trial court overruled the objection, finding that the State had "announced several race neutral reasons, that it's not a discriminatory challenge, and any accompanying motion with the objection would be denied."

Although defendant's citation of *Batson* indicated to the trial court that his objection to the State's peremptory challenge was based solely upon alleged racial discrimination, defendant contends in his brief to this Court that Maultsby's peremptory excusal was also improper gender discrimination. As to defendant's claim of racial discrimination, we have reviewed the trial court's findings and conclude that they are not clearly erroneous. Accordingly, defendant's *Batson* objection to the State's peremptory challenge was properly overruled.

As to defendant's claim of impermissible gender discrimination, we note that defendant amended the record on appeal to include an assignment of error alleging gender discrimination against prospective juror Maultsby. However, an assignment of error cannot substitute for proper preservation of an issue before the trial court. "[T]o preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1). The only exception is when a defendant claims plain error, and defendant has not made such a claim here. *Id.* 10(c)(4).

Ordinarily, failure to follow Rule 10(b)(1) justifies an "appellate court's refusal to consider the issue on appeal." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 195-96, 657 S.E.2d 361, 364 (2008); *see also State v. Raines*, 362 N.C. 1, 18, 26, 653 S.E.2d 126, 137, 142 (2007) (affirming the defendant's two capital sentences and not considering the merits of his constitutional arguments raised for the first time on appeal). A similar scenario arose in *State v. Best*, when the defendant objected at trial to the dismissal of female African-American prospective jurors on the basis of racial discrimination. 342 N.C. 502, 511, 467 S.E.2d 45, 51, *cert. denied*, 519 U.S. 878, 136 L. Ed. 2d 139 (1996). On appeal, the defendant additionally argued that the State's peremptory challenges of seven of nine African-American women established a prima facie case of gender discrimination. *Id.* at 513, 467 S.E.2d at 52. This Court held that because the defendant had not objected to any of the State's peremptory challenges on the ground of discrimination against women or African-American women, he could not raise the issue for the first time on appeal. *Id.*

Nevertheless, "[t]he imperative to correct fundamental error . . . may necessitate appellate review of the merits despite the occurrence of default." *Dogwood*, 362 N.C. at 196, 657 S.E.2d at 364.

Appellate courts may excuse a party's default when necessary to "expedite decision in the public interest" or to "prevent manifest injustice to a party." N.C. R. App. P. 2; *Dogwood*, 362 N.C. at 196, 657 S.E.2d at 364. This Court utilizes Rule 2 in its discretion to excuse default only "in exceptional circumstances." *Steingress v. Steingress*, 350 N.C. 64, 66, 511 S.E.2d 298, 299-300 (1999). We conclude that defendant's claim of gender bias in the State's peremptory challenge of prospective juror Maultsby is not an exceptional circumstance calling for invocation of Rule 2. Accordingly, defendant may not raise this question for the first time on appeal.

Defendant argues the trial court erred in overruling defense counsel's objections to the State's use of peremptory challenges against prospective jurors Recaldo Simmons, Nancy Britt, Katrina Gilliard,[1] and Jamie Boyd. Simmons is an African-American male, and the other three are African-American females. In each instance, the trial court considered defendant's objections and found no prima facie case of discrimination. When the trial court finds no such showing has been made, "our review is limited to whether the trial court erred in finding that defendant failed to make a prima facie showing, even if the State offers reasons for its exercise of the peremptory challenges." *State v. Smith*, 351 N.C. 251, 262, 524 S.E.2d 28, 37, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000). The trial court's ruling will be disturbed only if it is clearly erroneous. *State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, 522 (2005), *cert. denied*, 548 U.S. 925, 165 L. Ed. 2d 988 (2006).

As to prospective jurors Britt, Gilliard, and Boyd, defendant's arguments address both their race and their gender, sometimes together. Because neither the Supreme Court of the United States nor this Court has found that being a female member of a racial minority group is an independent basis for an objection to the State's exercise of a peremptory challenge, we will consider defendant's *Batson* arguments (race) and *J.E.B.* arguments (gender) separately.

Defendant argues that the record established a prima facie case of gender discrimination at the time of the State's peremptory challenges of prospective jurors Britt, Gilliard, and Boyd. As with prospective juror Maultsby, above, defendant amended the record on appeal to include assignments of error relating to allegations of gender discrimination against prospective jurors Gilliard and Boyd and

---

1. This prospective juror's name is spelled at different points in the materials filed with the appeal as "Gilliard," "Gillard," "Gilliand," and "Gilland."

to include an assignment of error relating to claims of both race and gender discrimination against prospective juror Britt. However, as stated above, an assignment of error cannot substitute for proper preservation of issues before the trial court, except when plain error is alleged. N.C. R. App. P. 10(b)(1); *id.* 10(c)(4). As with prospective juror Maultsby, defendant's trial counsel objected to the peremptory removal of Gilliard and Boyd on *Batson* grounds only. Defendant does not allege plain error. Moreover, we discern no exceptional circumstances meriting departure from the Appellate Rules here. *Steingress,* 350 N.C. at 66, 511 S.E.2d at 299-300. Because he did not raise and preserve the issue of gender discrimination before the trial court, defendant may not make a gender discrimination argument for the first time on appeal as to these two jurors.

Defendant next argues that the record established a prima facie case of racial discrimination at the time of his objection to the State's peremptory challenges of prospective jurors Simmons and Gilliard. However, the record does not support defendant's argument. We consider a number of factors that may be relevant in determining whether a defendant has raised an inference of discrimination. *State v. Quick,* 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995).

> Those factors include the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*Id.*

Focusing on prospective juror Simmons, defendant argues that the trial court's inquiry was insufficient because it did not consider the numbers and percentages of African-American prospective jurors who were challenged. Defendant asserts that when the State struck prospective juror Simmons, five of the State's eight strikes (62.5%) had been against African-Americans and the State had only accepted three of eight African-Americans (37.5%). However, numerical analysis in this inquiry, while often useful, is not necessarily dispositive, and a prima facie showing is not automatically made when the minority acceptance rate is 37.5%. *State v. Barden,* 356 N.C. 316, 344, 572 S.E.2d 108, 127-28 (2002) (citing, *inter alia, Gregory,* 340 N.C. at 398,

459 S.E.2d at 657), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). Moreover, defendant does not assert, and the record does not indicate, that the race of defendant, the victim, or any key witness was a factor in defendant's trial; moreover, the trial court indicated that, in denying defendant's motion, it considered the race of defendant and the victim, the consistent manner in which the State questioned Simmons and previous prospective jurors, and that the State had seated three African-Americans among the nine jurors then seated. In addition, as to prospective juror Gilliard, the trial court found no prima facie case after considering the way Gilliard was questioned, her questionnaire, the number of minorities seated, and the manner in which the State used its peremptory challenges. We conclude that the trial court did not err in finding no prima facie case of racial discrimination was established as to Simmons or Gilliard.

Defendant uses a similar statistical analysis to support in his claim that the State's peremptory challenge of prospective juror Britt was made on the basis of gender discrimination. The trial court noted that the State had at that point seated three females, used an almost equal number of challenges on males and females, and treated Britt no differently from other prospective jurors during questioning. Our review of the record confirms this assessment. We conclude that the trial court did not err in finding no prima facie case of gender discrimination in this challenge.

In short, upon thorough review of the record, we have found no prima facie case of discrimination based on race, gender, or, for that matter, a combination of race and gender as to prospective jurors Simmons, Britt, Gilliard, or Boyd. These assignments of error are overruled.

## GUILT PHASE ISSUES

[3] Defendant contends the trial court committed prejudicial error when it denied a jury request to review certain exhibits. Defendant argues that the trial court's denial was an abuse of discretion pursuant to N.C.G.S. § 15A-1233(a). Defendant also claims that the denial violated his constitutional rights to present evidence, to a fair trial, to due process of law, and to a reliable capital sentencing hearing. Defendant contends that he is entitled to a new trial or a new sentencing proceeding.

The trial transcript indicates that defendant intended to supplement the testimony of his expert witness, psychiatrist Moira Artigues (Dr. Artigues), by projecting her reports on a screen that the jury

could view as she testified. However, when technical difficulties with projection equipment cropped up unexpectedly, the documents were hurriedly photocopied for each juror. While the copies were being made, the State noted that Dr. Artigues had, up to that point, been testifying only from portions of her reports and the prosecution expressed concern that the jury might have access in the hard copies to inadmissible information upon which Dr. Artigues had not relied. The State indicated that the possible problem would be resolved if the documents were collected after Dr. Artigues' testimony and not used for other purposes. Defense counsel responded that their intention was to let the jury have the exhibits during the testimony for illustrative purposes only and then collect them. The State indicated its satisfaction with this procedure. The photocopies were provided to the jury and introduced into evidence for purposes of illustrating Dr. Artigues' testimony as defendant's Exhibits 19 through 44 and 46 through 58.

Two days later, during its deliberations at the guilt-innocence phase, the jury submitted a note requesting that the trial court "[p]lease provide a list of exhibits so that we may select which ones we would like to review. We would like [numbers] 19 [through] 58 (Defense)." In the ensuing colloquy between trial counsel and the trial court, the court accurately recalled that the exhibits were offered for illustrative purposes. However, when the judge stated, inaccurately, that he recalled the statement "we do not intend to send those items to the jury" was made, defense counsel responded that he did not remember saying the exhibits would not go back to the jury room, but only "that they would be removed from the jurors after" the testimony or after the jurors "looked at" the exhibits. The trial court then stated:

> The other option is simply this: in the court's discretion, I may instruct: "You have seen and heard all of the testimony and evidence. It is your duty to recall the same. If your recollection differs from that urged upon you by counsel, you shall in your deliberations be guided exclusively by your recollection of the testimony and the evidence. In the court's discretion, your request is denied."

The trial court also asked counsel if they could resolve the issue before the court made its final decision, but no agreement was reached. Defense counsel noted that by statute a judge may permit the jury to take exhibits to the jury room only with consent of all par-

ties, and prosecutors confirmed that they did not consent. After further discussion as to whether the judge's instruction to the jury should name the non-consenting party or cite the controlling statute, the trial judge stated: "The statutory reference in the case law is, in the court's discretion, denied. Bring [the jurors] in." The trial court instructed the jury that its duty was to recall the evidence and that, in the trial court's discretion, its request for those exhibits was denied.

Section 15A-1233 provides in pertinent part:

> (a) If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence.

> (b) Upon request by the jury and with consent of all parties, the judge may in his discretion permit the jury to take to the jury room exhibits and writings which have been received in evidence.

N.C.G.S. § 15A-1233 (2007). To comply with this statute, a court must exercise its discretion in determining whether or not to permit the jury to examine the evidence. *State v. Ashe*, 314 N.C. 28, 34, 331 S.E.2d 652, 656 (1985). A court does not exercise its discretion when it believes it has no discretion or acts as a matter of law. *Id.* at 35-36, 331 S.E.2d at 656-57 (citing *State v. Lang*, 301 N.C. 508, 510-11, 272 S.E.2d 123, 125 (1980)). However, when a trial court assigns no reason for a ruling which is to be made as a matter of discretion, the reviewing court on appeal presumes that the trial court exercised its discretion. *State v. Guevara*, 349 N.C. 243, 252, 506 S.E.2d 711, 717 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999).

A similar situation arose in *State v. Fullwood*, where the trial judge denied a jury request to review a portion of testimony because the court reporter who had recorded the testimony was no longer in the courthouse. 343 N.C. 725, 742, 472 S.E.2d 883, 892 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). The trial judge explained the situation to the jury, added that the decision was in his discretion, and reminded the jury to rely on its own recollection of the evidence. *Id.* After reviewing the record and transcripts, this Court found that the trial court plainly exercised its discretion. *Id.* at

743, 472 S.E.2d at 892. In contrast, we held in *State v. Ashe* that the trial court erred when it denied a jury request for a transcript by stating that there was no transcript at that point. 314 N.C. at 34-35, 331 S.E.2d at 656-57 (citing *Lang*, 301 N.C. at 510-11, 272 S.E.2d at 125). We noted that various methods existed for allowing a jury to review testimony, *id.* at 35 n.6, 331 S.E.2d at 657 n.6, then found that the court's response indicated that the judge mistakenly believed he was unable to grant the request and thus had no discretion to exercise, *id.* at 34-35, 331 S.E.2d at 656-57. Here, the trial judge noted numerous times that he was denying the jury's request in his discretion. Accordingly, we conclude that the trial court correctly understood that it was permitted to exercise its discretion pursuant to N.C.G.S. § 15A-1233.

Nor did the trial court abuse its discretion. Such an abuse occurs when a ruling "is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Peterson*, 361 N.C. 587, 602-03, 652 S.E.2d 216, 227 (2007) (internal quotation marks omitted), *cert. denied*, —— U.S. ——, 170 L. Ed. 2d 377 (2008). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *State v. Lasiter*, 361 N.C. 299, 302, 643 S.E.2d 909, 911 (2007).

Although the trial court made a trivial mistake when it attempted to recall specific words spoken when the exhibits were first discussed, the trial court's ruling is amply supported by the record. The exhibits were admitted solely for the purpose of illustrating an expert's testimony and the jury already had seen the exhibits in their entirety. The transcript of the discussion between the trial court and the parties when the exhibits were initially admitted indicates that these exhibits did indeed contain some inadmissible material. The trial court's decision was not an abuse of discretion.

Defendant also now contends that the trial court's action violated his constitutional rights to present evidence, a fair trial, due process of law, and a reliable capital sentencing hearing. However, we have held that "[a] constitutional issue not raised at trial will generally not be considered for the first time on appeal." *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002) (per curiam) (citing *State v. Nobles*, 350 N.C. 483, 495, 515 S.E.2d 885, 893 (1999); *Porter v. Suburban Sanitation Serv., Inc.*, 283 N.C. 479, 490, 196 S.E.2d 760, 767 (1973)). Because defendant did not raise these constitutional issues below, we decline to address them now.

**[4]** Defendant next contends that the trial court erred in denying his motion for a mistrial, made when law enforcement officers approached the jury box. Defendant argues that the denial of his motion was, under the totality of the circumstances, an abuse of discretion and that his constitutional rights to a fair trial and a reliable sentencing proceeding were violated.

This case understandably generated interest among law enforcement, and defendant made a pretrial motion to limit the presence of uniformed officers at trial. The trial judge declined to issue a blanket order but noted that he was aware of potential problems and would "keep a constant eye on" the situation. The trial court suggested that the prosecutor advise any officers who came to observe that it might be prudent if they dressed in mufti and also asked trial counsel to alert him if counsel saw a troubling number of uniformed officers.

During the guilt-innocence phase of defendant's trial, the State tendered into evidence autopsy photographs of Officer Prince. The photographs were then circulated to jurors who wished to see them. As the photographs circulated, three uniformed law enforcement officers (including one who had been a participant in the events of 18 January 2005 and had testified for the State earlier in the trial) stepped up to the courtroom bar, approximately eighteen inches to three feet from the jury.

As soon as the incident occurred, the officers were directed to sit down and the court held a bench conference. Counsel for the State informed the court that the officers stepped forward to form a shield to keep Officer Prince's mother from seeing the photographs. Defense counsel responded that the officers' actions could reasonably be inferred as intending to intimidate the jurors, then moved for a mistrial. The court ruled that:

> Motion for a mistrial, in the court's discretion, is denied. The court notes most of the jurors seemed to be looking in my direction. I owe an apology to every one of them but that would make it—I'm not sure they knew they were there. As far as intimidating effect, it was peculiar, but I don't think any jurors were intimidated.

The trial judge did not address the jurors about the incident but commented that "[t]hey wouldn't notice until we brought it to their attention. For all they know, the officers were up there trying to get a look at the pictures." Defendant renewed his motion for a

mistrial at the close of the State's evidence, and the court again denied the motion.

Defendant argues that the trial court abused its discretion in denying his motion for a mistrial. Defendant, contending that the behavior of the officers was inherently prejudicial, cites cases from other jurisdictions in which courtroom spectators' demonstrations of support for the victim were found to be grounds for a new trial: *Woods v. Dugger*, 923 F.2d 1454 (11th Cir.) (fair trial denied to the defendant when prison guards constituted approximately half the spectators filling the courtroom during a trial for murder of a prison guard), *cert. denied*, 502 U.S. 953, 116 L. Ed. 2d 355 (1991); *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990) (fair trial denied to the defendant when female spectators wore large buttons bearing the slogan "Women Against Rape" at the defendant's trial for kidnapping and non-consensual sexual intercourse); *State v. Franklin*, 174 W. Va. 469, 327 S.E.2d 449 (1985) (fair trial denied to the defendant when several spectators wore MADD buttons at the defendant's trial for driving under the influence resulting in death). Defendant further argues that the behavior of the officers was reflected in the subsequent unusual events at defendant's sentencing proceeding, which are detailed later in this opinion, thereby calling into question the reliability of defendant's sentence.

Our research has found no instance of similar conduct by police officers attending a criminal trial. A somewhat analogous situation arose in *Holbrook v. Flynn*, when four uniformed and armed state troopers sat in the front row of the spectator section at the defendant's trial. 475 U.S. 560, 562, 89 L. Ed. 2d 525, 530 (1986). The record in *Holbrook* indicated that the officers were present to ensure courtroom security. *Id.* at 562-63, 89 L. Ed. 2d at 530-31. In finding no error, the Supreme Court observed that a juror might draw any of several reasonable inferences from the presence of uniformed officers in a courtroom, whereas other procedures such as trying a defendant who is wearing prison garb are inherently prejudicial. *Id.* at 569, 89 L. Ed. 2d at 534-35. The Supreme Court declined to presume that any use of identifiable security guards in a courtroom is inherently prejudicial and adopted instead a case-by-case approach. *Id.* at 568-69, 89 L. Ed. 2d at 534-35. In *State v. Braxton*, some trial spectators wore badges that appeared to be photographs of one of the victims. 344 N.C. 702, 709-10, 477 S.E.2d 172, 176 (1996). The defendant argued that the presence of these badges was inherently prejudicial to his right to a fair trial. *Id.* at 710, 477 S.E.2d at 176. The record did

not indicate who wore the buttons, who was depicted on the buttons, or whether the jurors even noticed the buttons. *Id.* at 710, 477 S.E.2d at 177. This Court found that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial based on the buttons. *Id.*

We are mindful of the troubling aspects of the officers' behavior. While the record is unclear as to whether the officers actually came within the bar of the courtroom, the transcript leaves no doubt that some were quite close to several of the jurors. The record does not indicate whether the episode was planned or was spontaneous, but it is apparent that the trial court, counsel for the State, and counsel for defendant were unsure what had just happened, and why. Nevertheless, our review of the record satisfies us that the trial court did not abuse its discretion in denying defendant's motion for mistrial. The officers were immediately directed to sit back down as soon as the court perceived what was happening. The judge who observed the episode believed that jurors may not have even noticed the officers' conduct; did not believe that any jurors had been intimidated; found that little, if any, potential prejudice had occurred; and concluded that any further mention of the incident to the jurors would be counterproductive. Assuming that the jurors did notice the officers' conduct, several plausible inferences could have been drawn as in *Holbrook*, such as the State's suggestion to the trial court that the officers were shielding the victim's mother from the photographs, or the court's response that the officers may have wanted to look at the photographs themselves. Whatever the cause of the officers' behavior, the trial court acted promptly and effectively to regain control of the courtroom. We will not second-guess the trial court to presume that this incident was fatally prejudicial as a matter of law, and we do not perceive any abuse in the judge's exercise of his discretion to deny defendant's motion for a mistrial. N.C.G.S. § 15A-1061 (2007). This assignment of error is overruled.

**[5]** Defendant next contends the trial court erred in denying his motion to dismiss the charge of robbery with a dangerous weapon. Pointing out that defendant was not armed until he took Officer Prince's firearm, defendant argues that he cannot be convicted of robbery with a dangerous weapon when the object taken in the robbery is also the firearm used to perpetrate the offense. Defendant asserts that the State is required to prove that defendant actually possessed and used the weapon at the time the assault and robbery is committed. When the weapon is the object of the robbery, a defend-

ant does not control it before the taking. Therefore, according to defendant, the weapon used and the property obtained must be two distinct items. In addition, defendant argues that his conviction cannot be sustained under the continuous transaction theory because defendant was charged with taking only Officer Prince's weapon. Defendant contends that, even where the continuous transaction theory is applicable, a defendant cannot be convicted of robbery with a dangerous weapon solely for stealing the same weapon used to commit the robbery.

Section 14-87(a) provides in pertinent part:

> Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another . . . shall be guilty of a Class D felony.

N.C.G.S. § 14-87(a) (2007).

"[U]nder N.C.G.S. § 14-87(a), armed robbery is: (1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened." *State v. Hope*, 317 N.C. 302, 305, 345 S.E.2d 361, 363 (1986) (citation and internal quotation marks omitted). Under the facts of the case at bar, the only element in question is whether defendant's taking of Officer Prince's weapon was accomplished by use or threatened use of a firearm.

We have previously held that an armed robbery can be a continuous transaction, *id.* at 305-06, 345 S.E.2d at 363-64, and " '[w]here a continuous transaction occurs, the temporal order of the threat or use of a dangerous weapon and the taking is immaterial,' " *State v. Haselden*, 357 N.C. 1, 17, 577 S.E.2d 594, 605 (quoting *State v. Olson*, 330 N.C. 557, 566, 411 S.E.2d 592, 597 (1992)), *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003). Under analogous circumstances, when a defendant took a knife from the victim, threatened the victim with that knife, and then left the victim's store with the knife, *State v. Black*, 286 N.C. 191, 192, 209 S.E.2d 458, 459 (1974), we concluded that "[c]learly, defendant robbed [the victim] with a knife, or he did not rob [the victim] at all," *id.* at 196, 209 S.E.2d at 462.

Here, defendant emerged from the fight with Officer Prince's gun. Despite defendant's argument to the contrary, we see no reason

why the use of a weapon stolen from the victim cannot also be a part of the continuing transaction of the armed robbery. The evidence presented was sufficient for the jury to find that defendant's use of the gun was inseparable from the taking of it and defendant's efforts to flee. This assignment of error is overruled.

## SENTENCING PROCEEDING

[6] Defendant contends that the trial court committed reversible error in its rulings when the jury initially returned with a nonunanimous sentencing recommendation. First, defendant argues that the trial court misinterpreted the applicable statutes when it stated that it was required to instruct the jury to resume its deliberations. Second, defendant argues that the trial court failed to exercise its discretion when it denied his motions to impose a life sentence and for a mistrial. However, because the trial court correctly interpreted the statutes, because a nonunanimous poll alone does not provide authority to impose a life sentence, and because the record indicates that the trial court did exercise its discretion in denying a mistrial, these contentions are without merit.

After deliberating in the sentencing proceeding for just over one and one-half hours, the jury indicated it had reached a verdict. Upon inquiry by the trial court, the foreperson responded that the jury had arrived at a unanimous recommendation as to sentence and that he had personally answered, dated, and signed the Issues and Recommendation As To Punishment form (sentencing form). The foreperson affirmed that on the sentencing form the jury unanimously answered Issue One, "Yes"; Issue Two, "Yes"; and Issue Three, "No," and that it recommended that defendant be sentenced to life imprisonment. When the clerk asked whether this was the unanimous recommendation of the jury, the foreperson answered, "Yes." The clerk then asked, "So say you all?" and the jurors answered "Yes." These oral responses were consistent with the answers written on the sentencing form.

Then, as required by N.C.G.S. § 15A-2000(b), the trial court began polling the jurors individually. The court restated that the sentencing form responses were "Yes" as to Issues One and Two, and "No" as to Issue Three, with a unanimous recommendation of a sentence of life imprisonment, then asked the foreperson if this was still his recommendation. The foreperson responded, "Yes, sir." When the next two jurors were similarly questioned, both affirmed that their recommendation was consistent with the answers given on the verdict sheet.

However, the fourth juror polled answered "No" when asked whether his recommendation was consistent with the verdict sheet. The trial court immediately called a bench conference and defense counsel moved that the court impose a life sentence. The court responded: "Denied at this time. As I recall the statute it says it's my duty to direct them to retire and begin deliberations. Is that not correct?" State's counsel responded, "Yes, sir." Defense counsel then asked that the polling be completed. Counsel for the State agreed and the court completed polling the jury. Six of the remaining eight jurors stated that they disagreed with the responses that had been set out on the sentencing form, while two jurors affirmed agreement with the responses. After the polling appeared to be complete, the third juror polled (who had initially affirmed her agreement with the sentencing form responses) raised her hand and stated: "I think maybe I answered that the wrong way. I meant 'No' for mine."

The trial court then declared that there was not a unanimous sentencing recommendation and that its duty under North Carolina law was to direct the jury to resume deliberations. The jury was given a recess and defense counsel moved for a mistrial. The trial court responded: "In the court's discretion, the same is denied. These jurors have been out two, two and a half hours?" State's counsel answered, "An hour and 40 minutes."

After the recess, defense counsel "renew[ed] our motion for mistrial," pointing out that the jurors "had an opportunity to witness all emotions on both sides" and "reactions to their verdict." When the court asked defense counsel to clarify the grounds for his motion, defense counsel responded: "I mean specifically, there was crying. There was probably some happiness. I'm sure there was sadness and reactions on the other side. I only observed, myself personally, the reactions that were on this side of the bench. They varied from joy to crying." Defense counsel argued that in light of the reactions of spectators and the third juror's reversal of her position after the polling had appeared complete, no verdict could command confidence. As a result, defense counsel argued, the court should declare a mistrial. The court responded: "All right. The motion has been renewed. I've heard counsels' arguments and considered the same and, in the court's discretion, the motion is denied. The statute says that we shall—or the law says, we shall begin deliberations anew. And so we're going to try."

The trial court instructed the jury regarding the deliberative process, then directed the jurors to resume deliberations. Just over

an hour later, the jury again indicated that it had reached a verdict and defendant again renewed his motion for mistrial. After calculating the approximate time the jury had deliberated since being reinstructed, the court stated, "In the court's discretion denied." Upon returning to the courtroom, the foreperson indicated that changes to the sentencing form had been made in blue ink and that he had dated and re-signed the sentencing form. The altered sentencing form reflected a unanimous recommendation of death. The jury was polled in accordance with N.C.G.S. § 15A-2000(b), and each juror confirmed this recommendation.

Prior to entry of judgment, defense counsel stated:

> Judge, we respectfully renew our motion for mistrial. The grounds for that is the 6th, 8th, 9th and 14th amendments of the United States Constitution, Article One, Section One. 19, 23, 27, and 26. And the grounds really being that there was a very significant emotional response when the verdict was being read. And it was subsequent to that, that apparently they—a considerable reversal was had by the way of the jurors in the box, which led them to a—re-deliberations, which led to even more of a reversal even as to issues three and four. We think that the emotional outburst and such was something that'd be very difficult, especially to see the reaction of people, the victim's family to what would amount to a life sentence. And then the jury to go back and deliberate without being impaired by that process.

The court responded: "In the court's discretion, having had the opportunity to witness all of what occurred after the announcement that the verdict was not unanimous when first taken, denied."

Although defense counsel cited the constitutions of the United States and of North Carolina to the trial court in his motion for mistrial, and although defendant's assignment of error alleges that the trial court's rulings denied defendant his constitutional rights, in the body of his brief defendant makes only a statutory argument. "Questions raised by assignments of error . . . but not then presented and discussed in a party's brief, are deemed abandoned." N.C. R. App. P. 28(a). Defendant also contends that the court failed to exercise its discretion when it denied defendant's motion to impose a life sentence.

> When a trial court fails to exercise its discretion in the erroneous belief that it has no discretion as to the question presented, there

is error. Where the error is prejudicial to a party, that party is entitled to have the question reconsidered and passed upon as a discretionary matter.

*State v. McAvoy*, 331 N.C. 583, 591, 417 S.E.2d 489, 494 (1992).

Section 15A-1238, dealing with criminal trials in superior court generally, provides:

Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury must be polled. The judge may also upon his own motion require the polling of the jury. . . . If upon the poll there is not unanimous concurrence, the jury must be directed to retire for further deliberations.

N.C.G.S. § 15A-1238 (2007).

Section 15A-2000(b) specifically addresses sentencing proceedings in capital cases and provides in relevant part:

The sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors. Upon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror concurs and agrees to the sentence recommendation returned.

If the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment; provided, however, that the judge shall in no instance impose the death penalty when the jury cannot agree unanimously to its sentence recommendation.

*Id.* § 15A-2000(b) (2007).

While section 15A-1238 explicitly states that if a poll reveals lack of unanimity, the jury must be directed to retire for further deliberations, section 15A-2000(b) is silent as to what a court can or cannot do when the polling reveals a nonunanimous sentencing recommendation in a capital case. Defendant interprets these two statutes to support his argument that the trial court erred when it concluded that it did not have authority to impose a life sentence once the jury revealed itself to be nonunanimous. However, section 15A-2000(b) requires that a sentence recommendation in a capital case be agreed upon by a unanimous vote of twelve jurors. The statute authorizes the court to impose a sentence of life imprisonment in the absence of

STATE v. MANESS

[363 N.C. 261 (2009)]

jury unanimity only when the jury cannot, within a reasonable time, agree on its sentence recommendation.

Even when, as here, an inconsistency arises between the verdict and the responses of jurors during the polling process, the trial court must nevertheless allow the jury a reasonable opportunity to attempt to reach a unanimous sentence recommendation. Only when the court concludes that "the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation" may the court impose a life sentence. *Id.* § 15A-2000(b). A nonunanimous poll does not necessarily indicate that a jury cannot agree to a unanimous sentencing recommendation within a reasonable time, nor does such a poll automatically give the trial court authority to impose a life sentence. When defendant made his motion for a life sentence, the trial court affirmed that the jury had deliberated for little more than an hour and a half at the time it delivered its initial sentencing recommendation. No evidence suggested that the jury could not agree and the jury had given no indication that it was having trouble reaching a sentencing recommendation. The issue whether the jury might be unable to agree unanimously on a sentence recommendation was never raised. The trial court was correct in its conclusion that it lacked authority to impose a life sentence in this case at the time defendant made his motion.[2]

**[7]** Defendant also contends that the trial court failed to exercise its discretion in denying his motions for a mistrial. A trial judge may declare a mistrial at any time during the trial upon defendant's motion or with defendant's concurrence. *Id.* § 15A-1061 (2007). Although "[t]he decision to grant or deny a mistrial rests within the sound discretion of the trial court," *State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991), a trial court errs when it fails "to exercise its discretion in the erroneous belief that it has no discretion as to the question presented," *McAvoy*, 331 N.C. at 591, 417 S.E.2d at 494.

---

.2. The dissent argues that a trial court in a capital case has the discretionary power to impose a life sentence whenever a jury deliberating the appropriate sentence recommendation is not unanimous. However, the General Assembly has set out specific procedures to be followed in capital sentencing, thereby limiting and in some instances foreclosing the exercise of discretion by the trial court. Under the statute applicable here, the only contingency in which a trial court unilaterally shall impose a life sentence in a capital case is when the jury is nonunanimous after having deliberated for a "reasonable time." N.C.G.S. § 15A-2000(b). Otherwise, a capital sentencing recommendation is exclusively the province of the jury, *id.*; *State v. Smith*, 305 N.C. 691, 711, 292 S.E.2d 264, 276, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982) (trial court must enter judgment consistent with jury's recommendation of death), and the statute permits the trial court to intervene and impose a life sentence only when the jury cannot agree, not when the jury merely has not agreed.

**STATE v. MANESS**

[363 N.C. 261 (2009)]

Here, as detailed above, when the polling of the jury revealed a lack of unanimity, defendant initially moved for the trial court to impose a life sentence, and the trial court correctly concluded that it then lacked authority to grant such a motion. Defendant's motions for mistrial came later and were based on the premise that jurors had seen the reactions of those in the courtroom when the initial verdict indicating a recommendation of a life sentence was read. The record does not indicate that the trial court believed it had no discretion to declare a mistrial. Instead, each time it ruled on defendant's mistrial motions, the trial court specifically stated that it was denying the motions in its discretion. Accordingly, this assignment of error is overruled.

**[8]** Defendant argues the trial court committed plain error by allowing the jury to consider both the N.C.G.S. § 15A-2000(e)(4) and (e)(8) aggravating circumstances. However, we have held that submission of both the (e)(4) (crime committed for the purpose of avoiding or preventing a lawful arrest) and (e)(8) (crime committed against a law-enforcement officer while engaged in the performance of official duties) aggravating circumstances is not error because the (e)(4) aggravating circumstance focuses on the defendant's subjective motivation for his actions, while (e)(8) pertains to the underlying factual basis of the crime. *State v. Nicholson*, 355 N.C. 1, 47-49, 558 S.E.2d 109, 140-41, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002); *State v. Golphin*, 352 N.C. 364, 481-82, 533 S.E.2d 168, 243-44 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). We have recently treated this issue as a preservation issue, *State v. Polke*, 361 N.C. 65, 75, 638 S.E.2d 189, 195 (2006), *cert. denied*, —— U.S. ——, 169 L. Ed. 2d 55 (2007). However, because defendant has not denominated this issue in his brief as a preservation issue and has made a lengthy and sustained argument, we will address the merits of defendant's contention.

Defendant seeks to distinguish *Nicholson* and *Golphin*, claiming that in those cases the State presented distinct and separate evidence supporting each aggravating circumstance. Specifically, defendant argues that the motive of the defendant in *Nicholson* for killing an officer performing the official duty of responding to a domestic disturbance call was to avoid being arrested for having assaulted his wife. In *Golphin*, the officer was enforcing the traffic law, while the defendant's motive for killing the officer was to avoid arrest for auto theft. Defendant argues that, in contrast, his motive for killing Officer Prince was to avoid the very arrest that the officer was attempting to

carry out and that therefore, the evidence supporting the (e)(4) and (e)(8) aggravating circumstances impermissibly overlapped. However, our analysis in *Nicholson* applies here because the (e)(4) aggravating circumstance in this case focused on defendant's subjective intention to avoid being arrested, while the (e)(8) aggravating circumstance addressed the objective fact that the victim was a law enforcement officer performing his official duties. The facts here are almost identical to those in *Polke*, in which the defendant stole the service weapon of a sheriff's deputy who was attempting to arrest the defendant, then used the weapon to kill the deputy. 361 N.C. at 67, 638 S.E.2d at 190. Accordingly, we find no plain error in the trial court's instructions. This assignment of error is overruled.

**[9]** Defendant next contends the trial court erred by failing to give requested peremptory instructions as to two nonstatutory mitigating circumstances. Defendant asked the court to instruct that: "The defendant was cooperative with officers after being taken into custody and polite during interviews," and "The defendant has accepted responsibility for his criminal conduct." The trial court did give these instructions, but not peremptorily. Defendant argues that these circumstances were uncontradicted and supported by manifestly credible evidence and that the trial court was therefore required to give the instructions peremptorily, pursuant to *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996).

The record indicates that before the jury began its sentencing proceeding deliberations, the trial court gave peremptory instructions as to three statutory mitigating circumstances. The trial court also gave nonperemptory instructions as to one other statutory mitigating circumstance and submitted the statutory catchall mitigating circumstance. In addition, the trial court gave peremptory instructions as to twenty-one nonstatutory mitigating circumstances submitted by defendant. One of these was "at [an] early stage of the criminal process, the Defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer," and at least one juror found that this circumstance existed and had mitigating value.

However, while agreeing to instruct on defendant's requested nonstatutory mitigating circumstances that "[t]he Defendant was cooperative with officers after being taken into custody and polite during interviews" and "[t]he Defendant has accepted responsibility for his criminal conduct," the trial court declined to instruct

STATE v. MANESS

[363 N.C. 261 (2009)]

peremptorily. At least one juror found that the former mitigating circumstance existed and had mitigating value, but no juror found the latter circumstance. Defendant argues that the trial court erred in not instructing peremptorily as to these two nonstatutory mitigating circumstances.

"[A] trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly credible evidence." *Id.* at 449, 462 S.E.2d at 13. However, a peremptory instruction is not appropriate when the evidence is conflicting as to the circumstance. *State v. Call*, 353 N.C. 400, 412, 545 S.E.2d 190, 198, *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001).

As to the instruction that defendant was cooperative and polite, while some evidence supported the instruction, other evidence indicated that defendant was neither cooperative with officers after being apprehended nor polite during interviews. For instance, defendant claimed to interrogating officers that he blacked out both when Officer Prince grabbed him and later when he took Officer Prince's weapon, even though he also described what happened after the purported blackouts. Defendant initially denied knowing what was in the bag with which he hit Officer Prince and only later, when confronted, admitted that he knew a bottle had been in the bag. Moreover, State Bureau of Investigation Agent Francisco testified that defendant "kept trying to minimize the fact that he had struck Officer Prince with a weapon." Also, defendant's statements to the authorities were inconsistent with other evidence regarding the distance from which defendant shot Officer Prince. One of the officers who interviewed defendant testified that defendant was "[v]ery cocky" and "appeared almost proud of what he had done." Because the evidence was conflicting as to whether defendant was cooperative and polite after being apprehended and during interviews, the trial court did not err in declining to instruct peremptorily on this nonstatutory mitigating circumstance.

As to defendant's requested instruction that he accepted responsibility for his criminal conduct, the record indicates that, while defendant admitted killing Officer Prince and acknowledged that the killing was a terrible mistake, he authorized his attorneys to concede guilt to second-degree murder only. This Court has stated that a defendant's willingness to plead guilty to second-degree murder "is evidence only of defendant's willingness to lessen his exposure to the death penalty or a life sentence upon a first-degree murder convic-

tion." *State v. Carroll*, 356 N.C. 526, 549, 573 S.E.2d 899, 914 (2002), *cert. denied*, 539 U.S. 949, 156 L. Ed. 2d 640 (2003); *see also State v. Thompson*, 359 N.C. 77, 95, 604 S.E.2d 850, 865 (2004) (finding difficulty in assessing whether a defendant's willingness to plead guilty to first-degree murder in exchange for a sentence of life without parole had mitigating value in demonstrating an admission of the defendant's responsibility), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 80 (2005). Defendant's admissions regarding his behavior and concession of guilt to second-degree murder constituted a voluntary acknowledgment of wrongdoing, as to which the trial court instructed peremptorily and which at least one juror found to exist and have mitigating value, but these admissions constituted only a partial acceptance of responsibility for his criminal conduct, which the jury found beyond a reasonable doubt to be first-degree murder. Accordingly, the trial court did not err in declining to give this instruction peremptorily.

## PRESERVATION ISSUES

Defendant raises ten additional issues that he concedes previously have been decided by this Court contrary to his position. Defendant contends the trial court erred by sentencing him for both assault with a deadly weapon with intent to kill and attempted first-degree murder based upon the same conduct. As defendant acknowledges, we have rejected this argument. *State v. Tirado*, 358 N.C. 551, 578-79, 599 S.E.2d 515, 534 (2004), *cert. denied*, 544 U.S. 909, 161 L. Ed. 2d 285 (2005). Defendant next maintains that the trial court committed constitutional error because a short-form indictment is not sufficient to charge a defendant with first-degree murder, as was done here. This Court has consistently held that such indictments "are in compliance with both the North Carolina and United States Constitutions." *State v. Lawrence*, 352 N.C. 1, 10, 530 S.E.2d 807, 813-14 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001); *State v. Wallace*, 351 N.C. 481, 504-05, 528 S.E.2d 326, 341, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000).

Defendant asserts the trial court committed plain error by instructing the jury that it had to return unanimous answers to the sentencing form issues, because in practice a sentence of life without parole results when the jury does not unanimously answer "Yes." This Court has previously considered and rejected this argument. *State v. DeCastro*, 342 N.C. 667, 686-88, 467 S.E.2d 653, 662-64, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996); *State v. McCarver*, 341 N.C.

364, 388-94, 462 S.E.2d 25, 38-42 (1995), *cert. denied,* 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Defendant also assigns as plain error the trial court's use of "satisfy" in explaining the burden of proof on mitigation. Instructions using this term to explain the burden of proof have been found adequate. *State v. Payne,* 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Defendant also asserts that the trial court erred by instructing jurors to decide whether nonstatutory mitigating circumstances, including those circumstances which are uncontroverted, have mitigating value. This Court has previously considered and rejected this argument. *State v. Duke,* 360 N.C. 110, 141, 623 S.E.2d 11, 31 (2005) (citing *Payne,* 337 N.C. at 533, 448 S.E.2d at 109-10), *cert. denied,* 549 U.S. 855, 166 L. Ed. 2d 96 (2006).

Defendant assigns as plain error the trial court's jury instructions on the definition of "mitigation," contending that the definition is too narrow and precludes jury consideration of all proffered aspects of defendant's character. This Court has previously considered and rejected this argument. *State v. Goss,* 361 N.C. 610, 627, 651 S.E.2d 867, 878 (2007), *cert. denied,* —— U.S. ——, 172 L. Ed. 2d 58 (2008); *State v. Conaway,* 339 N.C. 487, 533-34, 453 S.E.2d 824, 853-54, *cert. denied,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Defendant contends the trial court committed plain error by its use of the term "may" instead of "must" in sentencing Issues Three and Four, thereby making consideration of proven mitigation discretionary. We have rejected this argument. *Duke,* 360 N.C. at 141-42, 623 S.E.2d at 31-32; *State v. Lee,* 335 N.C. 244, 286-87, 439 S.E.2d 547, 569-70, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994).

Defendant next argues that the trial court unconstitutionally precluded full and free consideration of mitigation in the balancing and weighing stages of the sentencing proceeding by instructing that each juror could consider at Issues Three and Four only those mitigating circumstances which that particular juror had found at Issue Two. This Court has previously considered and rejected this argument. *Lee,* 355 N.C. at 286-87, 439 S.E.2d at 569-70. Defendant contends that the trial court erred by allowing jurors who express unequivocal opposition to the death penalty to be struck for cause. This Court has "repeatedly held that prospective jurors who express an unequivocal opposition to the death penalty may be excused without violating a defendant's constitutional rights." *State v. Morgan,* 359 N.C. 131, 172, 604 S.E.2d 886, 911 (2004), *cert. denied,* 546 U.S. 830, 163 L. Ed. 2d 79 (2005).

Finally, defendant contends that the death penalty is inherently cruel and unusual, that North Carolina's capital sentencing scheme is vague and overbroad and involves subjective discretion, and that capital punishment is applied arbitrarily and capriciously pursuant to a pattern and practice of discrimination on the basis of race, sex, and poverty, all in violation of the North Carolina and United States Constitutions. This Court has previously considered and rejected these arguments. *See, e.g., Duke*, 360 N.C. at 142, 623 S.E.2d at 32; *Morgan*, 359 N.C. at 168-70, 604 S.E.2d at 908-09; *State v. Williams*, 304 N.C. 394, 409-11, 284 S.E.2d 437, 448 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982).

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. Thus, we reject these arguments.

## PROPORTIONALITY REVIEW

[10] In accordance with section 15A-2000(d)(2), we now consider whether the record supports the aggravating circumstances found by the jury, whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2007).

We begin with the aggravating circumstances. Defendant was convicted of one count of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule. The trial court submitted the following four aggravating circumstances: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (2) the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon, to wit, an E & J Brandy bottle; (3) the murder was committed against a law enforcement officer while engaged in the performance of his official duties; and (4) the murder was part of a course of conduct in which defendant engaged that included the commission by defendant of other crimes of violence against other persons. *Id.* § 15A-2000(e) (2007). The jury found each of these aggravating circumstances beyond a reasonable doubt. Our review of the record indicates that each of the four circumstances is fully supported.

Defendant contends that the death sentence was imposed under the influence of passion and prejudice. Defendant supports this argu-

ment by citing the incidents at trial where police officers approached the jury box as jurors viewed autopsy photographs, the jury's original nonunanimous recommendation of a life sentence, and the reaction in the courtroom to the jury's original sentencing recommendation. None of these incidents, as discussed above, nor anything else in the record indicates that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we turn to the issue of proportionality. We must determine whether the sentence of death is excessive or disproportionate by comparing this case with other cases where we have found the death sentence to be disproportionate. *Augustine,* 359 N.C. at 739, 616 S.E.2d at 536. This Court has found a death sentence disproportionate on eight occasions. *State v. Kemmerlin,* 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that defendant's case is not substantially similar to any of these.

First, the evidence shows that for the purpose of evading lawful arrest, defendant intentionally murdered a law enforcement officer who was performing his official duties. "[T]he N.C.G.S. § 15A-2000(e)(4) and (e)(8) aggravating circumstances reflect the General Assembly's recognition that 'the collective conscience requires the most severe penalty for those who flout our system of law enforcement.' " *Golphin,* 352 N.C. at 487, 533 S.E.2d at 247 (quoting *State v. Brown,* 320 N.C. 179, 230, 358 S.E.2d 1, 33, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987)).

> The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

*Id.* at 487-88, 533 S.E.2d at 247 (quoting *Hill*, 311 N.C. at 488, 319 S.E.2d at 177 (Mitchell, J. (later C.J.), concurring in part and dissenting in part)).

In addition, defendant was convicted of first-degree murder both under the felony murder rule and on the basis of malice, premeditation, and deliberation. "Although a death sentence may properly be imposed for convictions based solely on felony murder, a finding of premeditation and deliberation indicates a more calculated and cold-blooded crime for which the death penalty is more often appropriate." *Taylor*, 362 N.C. at 563, 669 S.E.2d at 276 (internal citations and quotation marks omitted).

Moreover, the evidence shows that despite the kneeling officer's pleas for mercy, defendant fatally shot Officer Prince multiple times. The evidence further indicates that defendant shot at the arriving back-up officer, fled the scene with Officer Prince's weapon, shot again when he abandoned his car, then hid under an occupied mobile home as armed police officers closed in, potentially endangering the innocent occupants. The jury found that the murder of Officer Prince was part of a course of conduct that included violent crimes against another person or persons, constituting the (e)(11) aggravating circumstance. This Court has never found a death sentence to be disproportionate when the jury found more than two aggravating circumstances to exist, and has found the N.C.G.S. § 15A-2000(e)(11) circumstance, standing alone, sufficient to support a death sentence. *Polke*, 361 N.C. at 77, 638 S.E.2d at 196.

This Court also compares the instant case with cases in which we have found the death penalty to be proportionate. *State v. Al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005), *cert. denied*, 547 U.S. 1076, 164 L. Ed. 2d 528 (2006). After carefully reviewing the record, we conclude that this case is more analogous to cases in which we have found the sentence of death proportionate than to the cases in which we have found it disproportionate or cases in which juries have consistently recommended sentences of life imprisonment. Although defense counsel assiduously presented pertinent mitigating circumstances and aspects of this case, including defendant's youth and difficult upbringing, we are nonetheless convinced that the sentence of death here is not disproportionate.

Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from error, and the death sen-

tence recommended by the jury and ordered by the trial court is not disproportionate.

NO ERROR.

Justice HUDSON dissenting.

Because I conclude that the trial judge here acted under the misapprehension that, when polling revealed the jury was not unanimous, he had no discretion to direct the jury to resume deliberations or instead to impose a life sentence on defendant, I respectfully dissent. I concur in the majority opinion except as to this sentencing issue. In my opinion, this failure to exercise discretion has profoundly prejudiced defendant, as it undermines confidence in the fairness of the ultimate sentence here—the death penalty. I would hold that the trial court's conclusion was an error of law and would vacate the sentence and remand for a new sentencing hearing.

This Court has consistently recognized—indeed, emphasized—the inherent authority and discretion of the trial judge to supervise and control the proceedings before him "to ensure fair and impartial justice for both parties." *State v. Fleming*, 350 N.C. 109, 126, 512 S.E.2d 720, 732 (citation omitted), *cert. denied*, 528 U.S. 941, 145 L. Ed. 2d 274 (1999). Since our earliest cases, we have entrusted trial judges with great discretion in assessing the possibility of undue influence on a jury:

> [A trial judge] is clothed with this power because of his learning and integrity, and of the superior knowledge which his presence at and participation in the trial gives him over any other forum. However great and responsible this power, the law intends that the Judge will exercise it to further the ends of justice, and though doubtless, it is occasionally abused, it would be difficult to fix upon a safer tribunal for the exercise of this discretionary power, which must be lodged somewhere.

*Moore v. Edmiston*, 70 N.C. 382, 390, 70 N.C. 470, 481 (1874). Although *Moore* specifically involved the trial court's discretion in dealing with undue influence on a jury, we have stressed the importance and scope of that discretion in all aspects of managing a trial by jury. *See, e.g., State v. Davis*, 317 N.C. 315, 318, 345 S.E.2d 176, 178 (1986) ("The trial judge has inherent authority to supervise and control trial proceedings. The manner of the presentation of the evidence is largely within the sound discretion of the trial judge and his con-

trol of a case will not be disturbed absent a manifest abuse of discretion." (citations omitted)); *State v. Blackstock,* 314 N.C. 232, 236, 333 S.E.2d 245, 248 (1985) ("In this connection it is well settled that it is the duty of the trial judge to supervise and control the course of a trial so as to insure justice to all parties.").

Here, the majority's construction of N.C.G.S. §§ 15A-1238 and -2000(b) restricts that principle, unnecessarily in my view. Moreover, the majority opinion's repeated statement that the trial court "lacked authority to impose a life sentence" inadvisably constrains the discretion of a trial judge overseeing a capital sentencing proceeding while also incorrectly framing the question before us. The issue is whether, given the language of N.C.G.S. § 15A-2000(b), the trial court had the discretion to choose among these options: (1) order the jury to resume deliberations; (2) impose a life sentence; or (3) declare a mistrial. The canons of statutory construction and prior case law demonstrate that it did.

According to the majority, the trial court's authority here was defined by N.C.G.S. § 15A-1238, which reads:

> Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury must be polled. The judge may also upon his own motion require the polling of the jury. The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict. If upon the poll there is not unanimous concurrence, the jury *must be directed* to retire for further deliberations.

N.C.G.S. § 15A-1238 (2007) (emphasis added). The majority maintains that § 15A-1238 controlled the situation faced by this trial judge because § 15A-2000(b) is "silent as to what a court can or cannot do where the polling reveals a nonunanimous jury as to sentencing recommendation in a capital case." The relevant portion of § 15A-2000(b) provides:

> The sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors. Upon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually. polled to establish whether each juror concurs and agrees to the sentence recommendation returned.
>
> If the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge *shall impose* a

sentence of life imprisonment; provided, however, that the judge *shall in no instance impose* the death penalty when the jury cannot agree unanimously to its sentence recommendation.

*Id.* § 15A-2000(b) (2007) (emphases added). Thus, § 15A-2000(b) tracks the basic outline of § 15A-1238 as to the return of a verdict by a jury and the subsequent polling of the jury, but § 15A-2000(b) eliminates the legislative command that "the jury must be directed to retire for further deliberations" if not unanimous.

The majority would graft that language onto § 15A-2000(b) with its holding that the trial court "lacked authority to impose a life sentence." Had the General Assembly intended to limit the trial court's discretion when a jury is nonunanimous in its capital sentencing recommendation, the language of § 15A-1238 clearly shows that it knows how to do so. *See, e.g., N.C. Baptist Hosps., Inc. v. Mitchell,* 323 N.C. 528, 538, 374 S.E.2d 844, 849 (1988) (in construing statute, noting "[t]here is no doubt that the legislature knows how to draft such language when it chooses to do so"). Nevertheless, " '[t]he short answer is that [the legislature] did not write the statute that way.' " *Russello v. United States,* 464 U.S. 16, 23, 78 L. Ed. 2d 17, 24 (1983) (quoting *United States v. Naftalin,* 441 U.S. 768, 773, 60 L. Ed. 2d 624, 630 (1979)).

Likewise, we have long held that, "[w]here one of two statutes might apply to the same situation, the statute which deals more directly and specifically with the situation controls over the statute of more general applicability." *Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs.,* 313 N.C. 230, 238, 328 S.E.2d 274, 279 (1985) (citations omitted); *see also Lowder v. All Star Mills, Inc.,* 301 N.C. 561, 579, 273 S.E.2d 247, 257 (1981) ("Where two statutory provisions appear, a special or particular provision will control over a general one." (citation omitted)); *State v. Baldwin,* 205 N.C. 174, 176, 170 S.E. 645, 646 (1933) ("A settled rule of construction requires that all statutes relating to the same subject shall be compared and harmonized if this end can be attained by any fair and reasonable interpretation, and that if two statutes are apparently incompatible, one general in its terms and the other special and expressive of a restricted application, the latter may be considered in the nature of an exception and sustained upon this theory." (citations omitted)); *State v. Johnson,* 170 N.C. 771, 776, 170 N.C. 685, 690-91, 86 S.E. 788, 791 (1915) (stating that a special statute controls over general statute that relates to the same subject matter and is inconsistent).

Here, section 15A-1238 falls under Article 73, "Criminal Jury Trial in Superior Court," while § 15A-2000(b) is within Article 100, "Capital Punishment," which the legislature specifically drafted to govern the conduct of capital proceedings. There is no indication that the General Assembly intended to make § 15A-1238, the more general act, controlling over § 15A-2000(b). *See Nat'l Food Stores v. N.C. Bd. of Alcoholic Control*, 268 N.C. 624, 629, 151 S.E.2d 582, 586 (1966) ("[T]o the extent of any necessary repugnancy between them, the special statute, or the one dealing with the common subject matter in a minute way, will prevail over the general statute, according to the authorities on the question, unless it appears that the legislature intended to make the general act controlling . . . ." (citation and internal quotation marks omitted)). Further, the rule of lenity requires us to "construe[] strictly" and resolve "[a]ll conflicts and inconsistencies" in penal statutes "in favor of the defendant." *State v. Scoggin*, 236 N.C. 1, 10, 72 S.E.2d 97, 103 (1952).

Although the unique factual situation presented by this case has never before been considered by this Court, we have discussed the discretion of the trial court in the context of N.C.G.S. § 15A-2000. In *State v. Sanders*, this Court affirmed the trial court's declaration of a mistrial based on a finding of "manifest necessity" after learning of juror misconduct during deliberations, including the jury's acting contrary to the instructions given by the trial court. 347 N.C. 587, 599, 496 S.E.2d 568, 576 (1998). The trial court sent the jury to deliberate, or resume deliberations, on three separate occasions before ultimately declaring a mistrial upon the State's motion. *Id.* at 597-98, 496 S.E.2d at 575. Our "thorough review of the record" led us to conclude that "the trial court properly exercised its discretion in ordering a mistrial." *Id.* at 599, 496 S.E.2d at 576.

This is not to suggest that *Sanders* should be read as having compelled the trial judge here to declare a mistrial. Rather, *Sanders* is instructive in that it discussed approvingly the trial court's "exploring alternative remedies which could have allowed the sentencing proceeding to continue" before its ultimate declaration of a mistrial. *Id.* at 600-01, 496 S.E.2d at 576-77. Sending the jury back to resume deliberations was one such option employed by the trial court in *Sanders*. Justice Frye, in his dissent in *Sanders*, stated even more succinctly his view of the "alternative remedies" available to the trial court under § 15A-2000(b), when faced with a nonunanimous jury: "The appropriate action was for the judge to either impose a sentence of life imprisonment or encourage the jurors to continue deliberating

to see if they could unanimously agree to a sentencing recommendation." *Id.* at 601, 496 S.E.2d at 577 (Frye, J., dissenting).

This language—admittedly, dicta—strongly suggests that this Court previously concluded that the trial court is vested with discretion to determine the most appropriate action when faced with a nonunanimous jury in a capital sentencing proceeding. Sending the jury back to resume deliberations is one acceptable option. However, according to the plain language of § 15A-2000(b), if the trial court determines that the jury has deliberated for a "reasonable time," imposing a life sentence is another alternative. *See State v. Johnson,* 298 N.C. 355, 370, 259 S.E.2d 752, 762 (1979) ("[W]hat constitutes a 'reasonable time' for jury deliberation in the sentencing phase should be left to the trial judge's discretion.").

Nevertheless, as reflected in the transcript, and as argued by defendant in his brief, the trial judge's error here was in believing that he was *required* to send the jury back to resume deliberations. The following excerpts from the transcript of sentencing, immediately after polling initially showed that the jury was not unanimous, clearly reflect that the trial judge believed he had no discretion at this point:

[DEFENSE COUNSEL]: I move that you impose a life sentence.

THE COURT: Denied at this time. *As I recall the statute it says it's my duty to direct them to retire and begin deliberations.* Is that not correct?

[DISTRICT ATTORNEY]: Yes, sir.

. . . .

[Again, after polling was concluded:]

THE COURT: . . . . Ladies and gentlemen, finding that there is not, at this time, a unanimous recommendation as to sentence . . . . *Under North Carolina law, it is thus my duty to direct you to retire and resume your deliberations.*

(Emphases added.) The trial court then sent the jury out for a short recess, during which defense counsel renewed the motion for a mistrial and mentioned the jury's "opportunity to witness all emotions on both sides," arguing that it was "prejudicial" for jury to see "emotions" and "reactions" to the sentencing recommendation, including "crying" and "some happiness." Defense counsel also referred to

Alicia Patrick, the third juror polled, changing her mind at the end of the polling, and he stated that "when you have a situation like that, we just are not going to be able to achieve a verdict that we could have confidence in." The defense again renewed its motion for a mistrial, and the trial court responded: "I've heard counsels' arguments and considered the same and, in the court's discretion, the motion is denied. *The statute says that we shall—or the law says, we shall begin deliberations anew.* And so we're going to try." (Emphasis added.)

As quoted by the majority, and under long-standing precedent:

When a trial court fails to exercise its discretion in the erroneous belief that it has no discretion as to the question presented, there is error. Where the error is prejudicial to a party, that party is entitled to have the question reconsidered and passed upon as a discretionary matter. In such cases, this Court may remand the case or take such other actions as the rights of the parties and applicable law may require.

*State v. McAvoy*, 331 N.C. 583, 591, 417 S.E.2d 489, 494-95 (1992) (citations omitted); *see also State v. Ashe*, 314 N.C. 28, 36-37, 331 S.E.2d 652, 657-58 (1985) (concluding that a trial court's complete failure to exercise discretion amounted to reversible error).

Here, the error was neither the denial of defendant's motion for a sentence of life imprisonment nor sending the jury back to resume deliberations. Instead, the error was the trial judge's erroneous belief, apparent from the transcript, that he had no discretion in reaching his decision. The trial judge faced a highly unusual situation: the jury indicated its unanimity; then, on polling, some individual jurors disavowed their assent to that unanimous recommendation, including one juror who changed her vote after already having been polled, all following emotional reactions in the courtroom to the initial recommendation of life imprisonment for a defendant convicted of killing a police officer. In light of these circumstances, it is impossible to determine how the trial judge might have ruled on defendant's motion for imposition of a sentence of life imprisonment had he been aware such a ruling was discretionary. Thus, this failure to exercise discretion was fundamental to the fairness of defendant's sentencing proceeding.

The authority of the trial judge to supervise and control proceedings in the courtroom is paramount in our criminal justice system. I do not necessarily find error in the trial court's decision to direct the

jury to resume deliberations; rather, I conclude only that the court erred in believing that decision was mandated. In my view, our precedents and long-standing rules of statutory construction clearly indicate that such a decision is discretionary. The trial court thus erred by failing to make the decision as an exercise of that discretion, resulting in the most extreme prejudice possible to defendant, a sentence of death. As such, I would vacate and remand for a new sentencing hearing for defendant.

Justice TIMMONS-GOODSON joins in this dissenting opinion.